JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

MARK RUMOLD, Cal. Bar #279060
Asst. Federal Public Defender
Attorney for Defendant
mark_rumold@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | |
|---|---|
| Plaintiff, | CR-23-8132-PCT-JJT |
| vs. | |
| Donald Day, Jr., | **DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| Defendant. | |

Defendant Donald Day, Jr. ("Mr. Day"), through undersigned counsel, respectfully moves the Court to dismiss the Indictment for insufficiency and pursuant to Fed. R. Crim. P. 7(c)(1). As set forth more fully in the accompanying memorandum of law, neither count states a crime because neither count involves a threat to a "natural person," as required under 18 U.S.C. § 875(c), and no count alleges a "true threat."

Excludable delay under 18 U.S.C. § 3161(h)(1)(D) may result from this motion or from an order based thereon.

Respectfully submitted: December 26, 2023.

JON M. SANDS
Federal Public Defender

/s/ *Mark Rumold*
Mark Rumold
Asst. Federal Public Defender

# MEMORANDUM OF LAW

## I.  FACTS[1]

On November 29, 2023, an Indictment was filed charging Mr. Day with 2 counts of violating Title 18 U.S.C. § 875(c). (Doc. 3). Specifically, it alleges that on December 16, 2022, Mr. Day posted a video on YouTube stating, "[w]ell, like my brother Daniel, like my sister Jane, it's no different for us. The devils come for us, they fucking die. It's just that simple. We are free people, We are owned by no one." The indictment alleges that "Daniel" and "Jane" are two Australian citizens who had been killed four days earlier following a stand-off with Australian police that began when "Daniel" and "Jane" opened fire on officers who approached their home to perform a welfare check on a third individual. Two police officers and a neighbor were killed in the incident. The indictment suggests Mr. Day's YouTube video was a response to a video posted by "Daniel" and "Jane" in the midst of the standoff in which they addressed Mr. Day directly, saying "[t]hey came to kill us, and we killed them. If you don't defend yourself against these devils and demons, you're a coward." The indictment alleges that Mr. Day's video constituted a "a threat to injure the person of another, that is any law enforcement individual who comes to DAY's residence."

The second count in the indictment alleges that Mr. Day threatened Tedros Adhanom Ghebreyesus, an Ethiopian government official currently serving as director-general of the World Health Organization. According to the indictment, Mr. Day posted the following comment on a video "depicting" Mr. Tedros: "It is time to kill these monsters, and any who serve them. Where are my kind? Where are you? Am I the only one? Fuckin' hell!" According to the indictment, the comment was posted to a video in

---

[1] The government provided initial discovery in this matter, via inter-office mail, on the afternoon of December 22, 2023. Because of the intervening holiday weekend and the voluminous nature of the discovery provided, as of December 26, 2023, Mr. Day has neither received nor reviewed the discovery in this case. This factual summary is therefore necessarily limited and is based solely on the allegations in the indictment.

which Mr. Tedros "discussed the discovery of a new virus called Marburg" which Mr. Tedros "described as similar to Ebola with a high mortality rate."

## II.   ARGUMENT

### A. The indictment fails to state an offense because neither charged statement is addressed to a "person" within the meaning of 18 U.S.C. § 875(c).

18 U.S.C. § 875(c) prohibits interstate communications containing threats "to injure the person of another." Unlike other subsections of Section 875, which expressly include communications made to non-natural persons such as firms, associations, or corporations, subsection (c) limits its prohibition to natural persons.

In *United States v. Havelock*, 664 F.3d 1284 (9th Cir. 2012) (en banc) Ninth Circuit, sitting en banc, considered the scope of the word "person" in the context of related statute 18 U.S.C. § 876(c), which prohibits mailing threatening communications "addressed to any other person and containing a threat to kidnap any person or any threat to injure the person of the addressee or of another." 18 U.S.C. § 876(c). The defendant in *Havelock* was a troubled individual who, on Super Bowl Sunday, armed himself with an assault rifle and deposited four letters to various media outlets into the U.S. postal mail before heading to the University of Phoenix Stadium in Glendale, where the game was being played. *Id.* at 1286–87. The defendant would later tell the police that he had intended to commit mass murder and be killed by responding police officers. *Id.* at 1287. One of the letters contained the statement, "I will make the ultimate sacrifice; I will give my life. And I will take as many of the baneful and ruinous ones with me . . . I will slay your children. I will shed the blood of the innocent." *Id*. Before anyone was injured, the defendant self-reported to the police. *Id.* at 1288.

He was charged with six counts of mailing threatening communications in violation of 18 U.S.C. § 876(c) for threats "to injure the person of another, specifically children and persons in the vicinity of the Super Bowl XLII event in Arizona." *Id.* The defendant moved to dismiss, arguing that because the communications were addressed to

media outlets they were not threats addressed to "any person." *Id.* The motion was denied, and the defendant was convicted at trial. *Id.*

On appeal, the government conceded that he media organizations on the envelopes were not "natural persons" but argued that the contents of the mailings, including the statements "I will slay your children," were threats addressed to "natural persons" within the meaning of the statute. *Id.* at 1291.

The en banc Ninth Circuit disagreed. *Id.* at 1296. It agreed with the government that it was proper not merely to look at the envelope but also the contents of the mailings themselves to determine to whom the communication was "addressed." *Id.* But it held that, because the communications "indicate[ ] nothing at all about the identity of any individual "person" to whom the communication was supposedly addressed," the communications could not be said to be addressed to a "natural person." *Id.* The Court explained, "It is impossible to determine (and is highly unlikely) that Havelock, in [writing 'I will slay your children'], was addressing any particular person whose children he was going to slay." *Id.* Thus, the Court held that "Havelock's writings were not addressed to natural persons." *Id.* It reversed the conviction and remanded to the district court for entry of a judgment of acquittal. *Id.*

Both counts of Mr. Day's indictment suffer from the same infirmity as the indictment in *Havelock*. It is "impossible to determine (and is highly unlikely) that [Mr. Day], in [writing 'The devils come for us, they fucking die.'], was [threatening] any particular person." *Id.* Indeed, the government does not allege that he was. Instead, it construes the comment as a threat against "any law enforcement official who comes to DAY's residence." But "any law enforcement official who comes to DAY's residence" is not a natural person, nor is it even a finite or bounded group of natural persons. It presumably includes not merely some unspecified number of federal, state, local, and even international law enforcement officials but would also include people who aren't

4

even police officers now but who may at some point in the future decide to become police officers such that they might someday have reason to go to Mr. Day's house.

This undefined and indefinite group of individuals is no more reasonably specific than "children and persons in the vicinity of the Super Bowl XLII event in Arizona." Indeed, it is less so. The group ostensibly "threatened," in *Havelock* was at least a finite and knowable group of natural persons. Yet, the Ninth Circuit found this level of specificity insufficient to say that the threats in *Havelock* were addressed to a "natural person."

It is true that *Havelock* concerned the "addressed to any other person" prong of § 876(c) and not the "threat to injure the person" prong, but there is no reason to believe that the word "person," used twice in the same sentence within the same statute, should have two different meanings within one sentence.

And the Ninth Circuit model jury instructions for § 875(c) confirm that the statute requires the allegedly violative communication "contain[ ] a threat" to kidnap or injure "[*insert name or title of natural person*]." Because "any law enforcement official who comes to DAY's residence" is not a "natural person," within the meaning of § 875(c), Count 1 fails to state a crime.

Count 2 is similarly infirm. Mr. Day does not dispute that Mr. Tedros, the director-general of the WHO, is a "natural person." Nevertheless, the allegation that the statement "[i]t is time to kill these monsters" is a threat directed to a specific individual is both grammatically and logically infirm. The government does not allege that Mr. Day's comment mentions Mr. Tedros, either by name or by title. The word "monsters" is plural, though the indictment doesn't allege anyone other than Mr. Tedros is "depicted in" the relevant video. Thus, the most plausible reading of the comment "[i]t's time to kill these monsters," is that it is directed not at Mr. Tedros specifically but rather at the either the WHO generally, or—more likely—at the global public health community, which promotes positions on public health with which Mr. Day disagrees.

Neither of these entities—the WHO or the global public health community—is a "natural person" for purposes of § 875(c). Count 2 is therefore legally insufficient.

### B. The indictment fails to allege a "true threat."

The First Amendment protects speech unless it falls into certain "well-defined" and "narrowly limited" categories. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942). Whether we like it or not, Americans frequently employ strong and even offensive language, particularly in political debates that take place online. "The language of the political arena . . . is often vituperative, abrasive, and inexact," and "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts v. United States*, 394 U.S. 705, 708 (1969). The Supreme Court has recognized that "[s]trong and effective extemporaneous rhetoric cannot nicely be channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause." *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 928 (1982).

"True threats" are excluded from constitutional protection only when they "communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). The Ninth Circuit has held that "predictions or exhortations to others to injure or kill" do not constitute "true threats." *United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011). And the use of "political hyperbole"—even violent political hyperbole—is similarly constitutionally protected. *Watts*, 394 U.S. at 708.

The Supreme Court established the "true threats" doctrine in *United States v. Watts*. Mr. Watts was an 18-year-old attending a public rally at the Washington Monument in 1966. He took the stage and said, "They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I'm not going. *If they ever make me carry a rifle the first man I want in my sights is L.B.J.*" 394 U.S. at 706 (emphasis added). Watts was convicted at trial of threatening the President. The Supreme Court

vacated the conviction. *Id.* at 708. It found the statute prohibiting threats to be constitutional as a general matter, but it noted that such statues must be interpreted "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide[]open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 264 (1964)). It held that Mr. Watts' "very crude offensive method of stating a political opposition to the president" was mere "political hyperbole" that was protected by the First Amendment." *Id.*

More, recently the Ninth Circuit has addressed constitutional protections afforded hateful expressions of political belief on the internet in *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011). In that case, the defendant was convicted at trial of threatening then-candidate Barack Obama by making two posts to a Yahoo! message board that used racial slurs, predicted violence would befall Mr. Obama, and exhorted others to commit such violence. Specifically, he posted "Re: Obama fk the [***], he will have a 50 cal in the head soon," and later "shoot the [***] country fkd for another 4 years+, what [***] has done ANYTHING right???? long term???? never in history, except [***]." *Id.* at 1115.

*Bagdasarian* noted that there were two elements that must be met for a statement to constitute a "threat." *Id.* at 1118. The first involved an objective test of whether "the statement would be understood by people hearing or reading it in context as a serious expression of intent to kill or injure." *Id.* The Court then held that neither statement passed this objective test. *Id.* at 1122. It noted that the statement that Obama "will have a 50 cal in his head soon" was a "prediction" that "conveys no explicit or implicit threat on the part of Bagdasarian that he himself will kill or injure Obama." *Id.* at 1119. The statement "shoot the [***]," on the other hand "is an imperative intended to encourage

others to take violent action, if not simply an expression of rage or frustration." *Id.* "The threat statute, however, does not criminalize predictions or exhortations." *Id.*

In light of *Watts* and *Bagdasarian*, neither statement charged in the Indictment constitutes a "true threat." With respect to Count 1," the statement, "The devils come for us, they fucking die," is similar in both form and substance to the statement, "If they ever make me carry a rifle the first man I want in my sights is L.B.J." *Watts* at 706. Both are conditional statements expressing opposition to government action with which the speaker disagrees and expressing an intent to violently resist the government actor that the speaker believes is acting immorally or unlawfully. Indeed, the statement by Mr. Day is even more clearly constitutionally protected than the statement at issue in *Watts*. Unlike the statement in *Watts*, which was directed towards a particular named government official, the statement by Mr. Day was addressed at unlawful government overreach in general.

According to the indictment, the statement, "The devils come for us, they fucking die," came in response to message by the deceased Australian couple that expressed their belief that the police officers who approached their house were "devils" who had "come to kill [them]." Even accepting as true the indictment's assertion that "devils" is code for "police officers," specifically, as opposed to "unlawful government actors" in general, Mr. Day's assertion that if "devils come [to kill] us," he would respond in kind cannot fairly be read as "a serious expression of an intent to commit an act of unlawful violence." *Black*, 538 U.S. at 359.

Count 2 is similarly constitutionally infirm. The statement, "It is time to kill these monsters, and any who serve them. Where are my kind? Where are you? Am I the only one? Fuckin' hell!" is not an "expression of intent" at all. *Id.* Specifically, it expresses no plan or intention on the part of Mr. Day to take any particular action now or at any time in the future. As in *Bagdasarian*, the statement is, at best, an exhortation "intended to encourage others to take violent action, if not simply an expression of rage

8

or frustration." *Bagdasarian* at 1119. *Bagdasarian* held that the phrase "shoot [Obama]"—an imperative statement directing others to commit acts of violence against a specific politician—was constitutionally protected political expression. By that standard, the statements alleged in Count 2 cannot be classified as "true threats" as a matter of law.

Nor are the statements in Count 2 reasonably read as unlawful incitement. The Supreme Court has repeatedly held that "advocacy of illegal action at some indefinite future time . . . is not sufficient to permit the [government] to punish . . . speech." *Hess v. Indiana*, 414 U.S. 105, 108 (1973); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[C]onstitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or law violation except where such advocacy is directed to inciting or producing imminent lawless action and likely to incite or produce such action.") The indictment does not even attempt to allege that Mr. Day's statements in Count 2 were designed to or likely to produce imminent acts of unlawfulness by others. Thus, no feature of the statement removes it from the broad protections of the First Amendment.

### III.   CONCLUSION

The statements alleged in the indictment were not statements of intent to harm a "person" as required under the statute.

Furthermore, the statements are not a "serious expression of an intent to commit an unlawful act of violence" and are therefore protected by the First Amendment to the United States Constitution.

For these reasons, both counts of the indictment must be dismissed as insufficient.