GARY M. RESTAINO
United States Attorney
District of Arizona
DAVID A. PIMSNER
Arizona State Bar No. 007480
ABBIE BROUGHTON MARSH
California State Bar No. 226680
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: david.pimsner@usdoj.gov
 Email: Abbie.Broughton.Marsh@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-23-08132-PCT-JJT |
|---|---|
| Plaintiff, | |
| vs. | **GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO DISMISS SUPERSEDING INDICTMENT** |
| Donald Day Jr., | |
| Defendant. | |

Defendant Donald Day, Jr. ("Day" or "Defendant") was initially charged with making two specific online threats, as alleged in the Indictment (Doc. 3).  Defendant subsequently moved to dismiss the Indictment (Doc. 23), which the Government opposed (Doc. 27).  On January 16, 2024, a grand jury in this District returned a Superseding Indictment (Doc. 29) charging Day with additional crimes, including possessing firearms and ammunition after sustaining a felony conviction (Count Three), possession of an unregistered firearm (Count Four) and threatening federal law enforcement officers after his arrest (Count Five)..  Defendant now moves for the extraordinary remedy of having the statutes in Counts Three and Four of the Superseding Indictment declared unconstitutional (Doc. 41).  Contrary to Defendant's motion, the statutes underlying Counts Three and Four are constitutional—as numerous federal courts have held over the past several years.  Accordingly, and as detailed further herein, Defendant's motion should be denied.

1

**Background**

2          The Government incorporates by reference the factual background set forth in its

3   opposition to Defendant's first motion to dismiss the Indictment (Doc. 27 at 1-3).  By way

4   of additional background, on December 1, 2023, when Defendant was arrested for making

5   online threats, law enforcement officers recovered eight firearms and thousands of rounds

6   of ammunition from Day's residence and personal vehicle (Doc. 29 at 7-9).  At trial, the

7   Government intends to offer evidence showing, among other things, that: multiple

8   witnesses personally saw Defendant possessing firearms (Day even previously threatened

9   to shoot one of these witnesses); Defendant's fingerprint was identified on a receipt for

10  ammunition that was located in the same room as most of the firearms and within the box

11  where there were three buckets of ammunition with approximately 10,000 rounds of

12  ammunition; a number of Defendant's own online statements (*e.g.*, "In order to maintain

13  my ammo cache, I work outside the system," "my wife has a lunch packed for me, my gear

14  is within arms reach of me, my rifle is oiled, and I am ready to head out of the door in less

15  than 5 minutes 24/7/365," "these days, I just watch the stupid through the keyhole, 'til it's

16  time to center my rifle barrel through it."); Defendant's post-arrest statement where he

17  admitted to purchasing the ammunition, but would not tell the agents which store;

18  Defendant's status as a prior convicted felon; Defendant's knowledge of that status (*e.g.*,

19  court records as well as Defendant's own statement that he was a "x-con, who's armed to

20  the teeth"); and the interstate nexus of the firearms and ammunition that Defendant

21  possessed.

22         On January 16, 2024, a grand jury in this District returned the five-count

23  Superseding Indictment.  At issue here in the Defendant's instant motion are Counts Three

24  and Four.  Count Three charges Defendant with being a felon in possession of a firearm,

25  in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(8).  Count Four

26  charges Defendant with being in possession of an unregistered firearm, in violation of Title

27  26, United States Code, Sections 5841, 5845(a)(1), 5861(d), and 5871.  Defendant's motion

28

1  to dismiss two counts in the Superseding Indictment asks this Court to declare the statutes

2  charged in Counts Three and Four unconstitutional.[1]

3  **Argument**

4  **I.    Standard**

5        Defendant's second motion to dismiss parts of the Superseding Indictment (Doc.

6  41) is governed by Rule 12 of the Federal Rules of Criminal Procedure.  Federal Rule of

7  Criminal Procedure 12(b) permits a pretrial motion to dismiss "that the court can determine

8  without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  However, in ruling on such a

9  motion, "the district court is bound by the four corners of the indictment."  *United States

10 v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  The motion "cannot be used as a device for a

11 summary trial of the evidence."  *Id*. (citation omitted).  The "unavailability of Rule 12 in

12 determination of general issues of guilt or innocence . . . helps ensure that the respective

13 provinces of the judge and jury are respected[.]"  *United States v. Nukida*, 8 F.3d 665, 670

14 (9th Cir. 1993).

15 **II.    Summary of Argument**

16       First, Ninth Circuit precedent upholding Title 18, U.S.C. § 922(g)(1) in response to

17 Second Amendment challenges remains binding and forecloses Defendant's claim to

18 dismiss Count Three of the Indictment. *United States v. Vongxay,* 594 F.3d 1111 (9th Cir.

19 2011). Second, even if *Bruen* abrogates *Vongxay*, § 922(g)(1) is consistent with the

20 Nation's historical tradition of firearms regulation and is therefore constitutional under

21 *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  Third, defendant's

22 claim to dismiss Count Four of the Superseding Indictment fails because, as many other

23 courts have held, the Second Amendment does not protect possession of an unregistered

24 dangerous weapon.  Indeed, Defendant does not cite a case, nor is the Government aware

25 of a case, that has declared Title 26 U.S.C. § 5861(d) unconstitutional. Accordingly, the

26

27       [1] Defendant also reasserts his arguments in his first motion to dismiss the Indictment
   (Doc. 23) without restating those arguments in his instant motion. Similarly, the
28 Government reasserts and incorporates by reference herein its previous opposition (Doc.
   27) to Defendant's first motion to dismiss the Indictment.

1    Court should decline to grant the extraordinary remedy of declaring these statutes

2    unconstitutional on their face or as applied to Defendant.[2]

3    **III.    Analysis**

4              **a.   Under Binding Ninth Circuit Precedent, § 922(g)(1) is Constitutional.**

5                        i.   The Supreme Court held in *Heller* that the Second Amendment

6                             protects an individual right of law-abiding citizens.

7              The Second Amendment provides: "A well regulated Militia, being necessary to the

8    security of a free State, the right of the people to keep and bear Arms, shall not be

9    infringed." U.S. Const. Amend. II. In *District of Columbia v. Heller*, the Supreme Court

10   concluded, "on the basis of both text and history, that the Second Amendment conferred

11   an *individual* right to keep and bear arms." 554 U.S. 570, 595 (2008) (emphasis added).

12             The Court made clear in *Heller*, however, that "the right secured by the Second

13   Amendment is not unlimited." *Id.* at 626; *cf. id.* at 635 (noting by way of analogy that

14   certain types of speech, including "obscenity, libel, and disclosure of state secrets," fall

15   outside the scope of the First Amendment's free-speech clause). With respect to the Second

16   Amendment, the Court identified the right to keep and bear arms as belonging to "law-

17   ───────────────

18             [2] In his motion, Defendant mounts both a facial challenge and a challenge as applied
     to him.  Defendant's brief motion does not go into many specifics on either front.  With
19   respect to a facial challenge, that fails for several reasons. First, defendant cannot show
     that either statute is unconstitutional in all its applications as is required under the more
20   exacting standard for a facial constitutional challenge. *See United States v. Kaczynski*, 551
     F.3d 1120, 1124 (9th Cir. 2009) ("A facial challenge to a [statute] is ... the most difficult
21   challenge to mount successfully, since the challenger must establish that no set of
     circumstances exists under which the [statute] would be valid.").  Only an as-applied
22   analysis is warranted under *Bruen's* analytical framework, as "[e]mbedded in the
     traditional rules governing constitutional adjudication is the principle that a person to
23   whom a statute may constitutionally be applied will not be heard to challenge that statute
     on the ground that it may conceivably be applied unconstitutionally to others, in other
24   situations not before the Court."  *Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973).
     Finally, even if defendant's facial challenge to Section 922(g) is warranted, the Ninth
25   Circuit has long held that this statute is facially constitutional. *See United States v. Hanna*,
26   55 F.3d 1456 (9th Cir. 1995).

27

28

abiding, responsible citizens." *Id.* at 635. And consistent with that understanding, the Court specifically stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which the Court deemed "presumptively lawful." *Id.* at 626 & n.26. Indeed, the Court stated that Heller—the plaintiff in that case—would be entitled to keep a handgun in his home "assuming" that he is "not disqualified from the exercise of Second Amendment rights." *Id.* at 635; *see also id.* at 631 (noting the assumption that Heller was "not a felon").

In approving felon-disarmament laws, the *Heller* Court adopted a position that had been urged by the plaintiff, many of his amici, and the United States. The plaintiff assured the Court that, although the Second Amendment secured an individual right to keep and bear arms, "basic firearm safety laws," such as the "prohibition on possession of guns by felons," would "easily" pass constitutional muster. Resp. Br. at 57, *Heller*, *supra* (No. 07-290). Many amici who supported the plaintiff similarly assured the Court that "bans on ownership by felons" are among the "many valid restrictions on the right to keep and bear arms," NRA Amicus Br. at 22, *Heller*, *supra* (No. 07-290), and that laws disarming "convicted felons" are "consistent with centuries of common law," Texas Amicus Br. at 35, *Heller*, *supra* (No. 07-290). And the United States devoted a section of its amicus brief to marshalling "historical evidence" that the right to keep and bear arms "simply does not extend to felons." U.S. Amicus Br. at 25-26, *Heller*, *supra* (No. 07-290).

In embracing the same view, the Court's decision in *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons." *NYSRPA* v. *City of New York*, 140 S. Ct. 1525, 1540-1541 (2020) (Alito, J., dissenting). Or, as then-Judge Kavanaugh put it, "the Court in *Heller* affirmatively *approved* . . . felon-in-possession laws . . . based on a history-and-tradition-based test." *Heller* v. *District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

Two years later, in *McDonald v. City of Chicago*, a plurality of the Court "repeat[ed]" the "assurances" that *Heller* "did not cast doubt on such longstanding

regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. 742, 786 (2010) (*quoting Heller*, 554 U.S. at 626).

> ii.    Following *Heller*, the Ninth Circuit upheld § 922(g)(1) based on the text and history of the Second Amendment.

*Vongxay*, a Ninth Circuit decision that postdates *Heller* and *McDonald*, upheld the constitutionally of § 922(g)(1), rejecting a nonviolent felon's claim that the statute violated his Second Amendment rights. 594 F.3d 1118 (9th Cir. 2011). As the Ninth Circuit held, felons are "categorically different from the individuals who have a fundamental right to bear arms." *Id.* at 1115. Relying on passages from *Heller* noted above, the Ninth Circuit determined that "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)." *Id.* at 1114-15. "Nothing," is strong language indeed. To confirm its conclusion, the Ninth Circuit also examined "cases from other circuits and [] historical gun restrictions." *Id.* at 1116-17. And while recognizing that the "historical question" had not been "definitively resolved," the Ninth Circuit concluded that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry],'" which excludes criminals. *Id.* at 1118 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue, 49 Law & Contemp. Probs.* 143, 146 (1983), and citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).

The Ninth Circuit's decision in *Vongxay* did not—even as an alternative holding—engage in an analysis involving intermediate scrutiny, strict scrutiny, or any "means-end" scrutiny balancing the costs and benefits of prohibiting felons from possessing firearms. *Cf.* 594 F.3d at 1117 (mentioning "heightened scrutiny" only to describe the Fifth Circuit's pre-*Heller* precedent). Instead, the Court in *Vongxay* based its holding on *Heller*'s "analy[sis] [of] the history of the Second Amendment." 594 F.3d at 1115.

The Ninth Circuit has since relied on *Vongxay* to repeatedly reject Second Amendment challenges to § 922(g)(1). *See, e.g.*, *United States v. Phillips*, 827 F.3d 1171, 1173-74 (9th Cir. 2016); *Van Der Hule v. Holder*, 759 F.3d 1043, 1050-51 (9th Cir. 2014);

*cf. United States v. Chovan*, 735 F.3d 1127, 1144-45 (9th Cir. 2013) (Bea, J., concurring) (observing that "*Heller* seemed to equate the status of a felon . . . with a presumptive disqualification from the Second Amendment right," because "[t]hroughout history, felons have been subject to forfeiture and disqualification").

> iii. *Vongxay* remains controlling precedent, and its history-based analysis was reaffirmed—not overruled—by *Bruen*.

The Supreme Court's recent decision in *Bruen* does not disturb the holding in *Vongxay*. *Heller* based its reasoning on the "text and history" of the Second Amendment, 554 U.S. at 595, as did *Vongxay*, 594 F.3d at 1115, 1118 (relying on the historical analysis in Heller and by "scholars of the Second Amendment"). And in *Bruen*, the Supreme Court reaffirmed this focus on "the Second Amendment's text, as informed by history." 142 S. Ct. at 2127; *see also id.* at 2128-29. The *Vongxay* court presciently fulfilled the *Bruen* court's text and history analysis directives.

*Bruen* involved a state licensing regime for the public carrying of handguns that required applicants to demonstrate a "special need" to carry a gun in public. *Id.* at 2122. The applicants and the state agreed that the Second Amendment "protect[s] the right[s]" of "ordinary, law-abiding citizens . . . to carry handguns publicly for their self-defense." *Id.*; *see also id.* at 2134 (looking to the Second Amendment's text and explaining that "'bear' naturally encompasses public carry"). The court of appeals, however, had upheld the "special need" licensing regime on the ground that it satisfied intermediate scrutiny—*i.e.*, that restricting the right to bear arms in public to those with a special need was "substantially related to the achievement of an important governmental interest." *Id.* at 2125.

*Bruen* rejected such an "interest-balancing inquiry" or "means-end test" as inconsistent with *Heller*. *Id.* at 2129 (quotation marks omitted). Rather than apply a standard that "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests," a court should look to "text and history" to "defin[e] the character of the right"

1   or "the outer limits of the right," or to "assess[] the constitutionality of a particular

2   regulation." *Id.* (quotation marks omitted). *Bruen* then undertook a lengthy historical

3   analysis, *id.* at 2138-56, concluding that a state cannot "prevent[] law-abiding citizens with

4   ordinary self-defense needs from exercising their right to keep and bear arms" in public.

5   *Id.* at 2156.

6        Nothing in *Bruen* undermined *Vongxay*, or *Heller*'s recognition that felons do not

7   have a constitutional right to bear arms. To the contrary, *Bruen*'s analysis implicitly

8   acknowledged *Heller*'s exclusion of felons from "the people" protected by the Second

9   Amendment. *See id.* at 2134 ("It is undisputed that petitioners Koch and Nash—two

10  ordinary, *law-abiding*, adult citizens—are part of 'the people' whom the Second

11  Amendment protects." (Emphasis added, citing *Heller*, 554 U.S. at 580)); *see also, e.g.*,

12  *Heller*, 554 U.S. at 635 ("law-abiding, responsible citizens").  Indeed, *Bruen* repeatedly

13  limited its definition of the scope of the right to "law-abiding" citizens, using that phrase

14  no fewer than 14 times throughout the opinion.  *See* 142 S. Ct. at 2122, 2125, 2131, 2133-

15  34, 2135 n.8, 2138 & n.9, 2150, 2156.  And consistent with that definition of the scope of

16  the right, *Bruen* approved of "shall-issue" state licensing regimes that "often require

17  applicants to undergo a background check or pass a firearms safety course," because such

18  requirements "are designed to ensure only that those bearing arms in the jurisdiction are,

19  in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 & n.9 (quoting *Heller*, 554 U.S. at

20  635).

21       The Justices' statements in *Bruen* itself confirm that it is not "clearly

22  irreconcilable" with *Vongxay*. In his concurrence, Justice Alito noted that nothing in

23  *Bruen* "disturbed anything that [the Supreme Court] said in *Heller* or [*McDonald*] about

24  restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142

25  S.Ct. at 2157 (Alito, J., concurring). Similarly, Justice Kavanaugh, joined by Chief

26  Justice Roberts, "underscore[d]" that "the Second Amendment allows a variety of gun

27  regulations," and that "nothing in our opinion should be taken to cast doubt on

28  longstanding prohibitions on the possession of firearms by felons." *Id.* at 2161-62

(Kavanaugh, J., concurring) (cleaned up) (quoting *Heller*, 554 U.S. at 626, 636)). Even Justice Breyer's dissent, joined by Justices Sotomayor and Kagan, "under[stood] the Court's opinion … to cast no doubt on [the] aspect of *Heller*'s holding" regarding the validity of felon-in-possession laws. Id. at 2189 (Breyer, J., dissenting).

*Vongxay* can be applied consistently with *Bruen*. To the extent that the above-referenced statements are non-controlling dicta, "Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold," and courts can "not blandly shrug them off because they were not a holding." *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) (quoting *Zal v. Steppe*, 968 F.2d 924, 935 (9th Cir. 1992) (Noonan, J., concurring and dissenting)). Put simply, "when the Court speaks, [lower courts] should take notice." *Shivkov v. Artex Risk Solutions, Inc.*, 974 F.3d 1051, 1067 (9th Cir. 2020) (internal citation omitted).  Five sitting Supreme Court justices have indicated that felon in possession laws are constitutional, even after the new mode of analysis announced in *Bruen*. Considering these pronouncements by a majority of the Supreme Court, the Court cannot conclude that *Vongxay* is "clearly irreconcilable" with *Bruen*. *Vongxay*'s holding, therefore, is still good law and 18 U.S.C. § 922(g)(1) remains constitutional.[3]

Defendant's argument fails to recognize that *Vongxay* did not rely exclusively on *Heller*'s categorization of felon-in-possession bans as presumptively lawful to uphold § 922(g)(1). *Vongxay* also considered the history and purpose of the Second Amendment— exactly the historical approach applied in *Bruen*. *Vongxay*, 594 F.3d at 1117-18.  *Vongxay* and its progeny constitute controlling circuit precedent holding that § 922(g)(1) is constitutional as applied to felons. *Bruen* repeatedly affirmed *Heller* and its definition of the scope of the Second Amendment right as excluding felons, a definition the Ninth Circuit followed in *Vongxay* when concluding that felons are "categorically different from

---

[3]      Because the votes of Justices Kavanaugh and Roberts were necessary to form the *Bruen* majority, the limits underscored by their concurrence are binding to the extent the Court's opinion might otherwise be construed more broadly.  *See United States v. Davis*, 825 F.3d 1014, 1021-22 (9th Cir. 2016) (en banc).

the individuals who have a fundamental right to bear arms." 594 F.3d at 1115-16; *see also Mai v. United States*, 974 F.3d 1082, 1093 (9th Cir. 2020) (dissent) (relying on *Vongxay* to explain felons fall outside the Second Amendment right because, "[u]nless pardoned, expunged, or set aside, a conviction always remains a conviction under the law"). The fact that *Bruen* rejected an analysis that *Vongxay* did not deploy—means-end scrutiny—does not mean that *Bruen* "effectively overruled" *Vongxay*. *Miller*, 335 F.3d at 893. *Vongxay* remains binding precedent, and it forecloses defendant's challenges to the constitutionality of § 922(g)(1).

Defendant asserts that "numerous courts around the country have declared 18 U.S.C. § 922(g)(1) unconstitutional . . ." (Doc. 41 at 6). None of those six cases, however, are in the Ninth Circuit, two cases are from the same District, and the Government is appealing in all six cases. *See* Doc. 41 at 3. Defendant also does not address Ninth Circuit case law such as *Vongxay* that similarly upholds the Constitutionality of 922(g)(1), albeit employing the required "text and history" approach rather than a disapproved "means-end" test. Defendant's assertion fundamentally misreads *Heller* and *Bruen* and fails to address the analysis applied in *Vongxay* itself.

Moreover, Defendant fails to mention the multitude of cases that have upheld the constitutionally of Section 922(g)(1) following *Bruen*. Circuit courts to address the issue have recognized that *Bruen* does not cast doubt on the constitutionality of 18 U.S.C. § 922(g)(1) as applied to convicted felons. *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023) ("[W]e conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)."); *Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) ("Though Bruen created a new test for determining the scope of the Second Amendment, the Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons."); *United States v. Dubois*, 20 Cr. 305, Doc. 62-1 at *8 (11th Cir. 2024) ("[O]ur precedent forecloses Dubois's argument that section 922(g)(1) violates the Second Amendment."); *see also United States v. Jones*, 88 F.4th 571, 574 (5th Cir. 2023) ("Given the absence of binding precedent holding that §

922(g)(1) is unconstitutional, and that it is unclear that *Bruen* dictates such a result, we have rejected plain-error challenges to § 922(g)(1) under *Bruen* in several unpublished opinions."); *United States v. Miles*, 86 F.4th 734, 741 (7th Cir. 2023) (finding no plain error for the district court to uphold the constitutionality of § 922(g)(1)).

Defendant's citation to *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc) in support of his as-applied challenge is misplaced. First, as discussed above, this Court is bound by *United States v. Vongxay* 594 F.3d 1111 (9th Cir. 2010), which has upheld § 922(g)(1) based on an historical analysis of the Second Amendment. Second, the petitioner in *Range* sustained a state misdemeanor conviction for making a false statement to obtain food stamps. *Range*, 69 F.4th at 99. The Third Circuit made clear that its decision was a "narrow" one and that the government had not shown "a longstanding history and tradition of depriving people like Range of their firearms." *Id.* at 101-106. This "narrow" decision, *id.* at 106, did not address whether § 922(g)(1) is unconstitutional as applied to felons, much less a felon convicted of larceny, nor conflicts with the conclusion (adopted by the other circuits to consider the issue) that § 922(g)(1) is constitutional as applied to felons. Finally, the Government believes the Third Circuit's decision in Range is simply wrong.[4]

In addition to the Eighth, Tenth, Eleventh, Fifth, and Seventh Circuits, District Courts in the Ninth Circuit that have routinely addressed the constitutionality of Section 922(g)(1) have universally -- and repeatedly -- rejected the same argument Defendant makes here. Indeed, within the Ninth Circuit, as far as the government is aware, not a single district court has held that prohibiting a felon from possessing a firearm or ammunition is unconstitutional. *See e.g.*, *Walker v. Bonta*, 2023 WL 2815356, at *3 (S.D. Cal. Apr. 6, 2023); *United States v. Gunthery*, 2023 WL 2696824, at *3-4 (E.D. Cal. Mar. 29, 2023); *United States v. Kilgore*, 2023 WL 2505012, at *2-3 (E.D. Cal. Mar. 14, 2023); *United States v.*

---

[4] On October 5, 2023, the United States filed a petition for a writ of certiorari asking the Supreme Court to review the Third Circuit's decision. *Att'y General v. Range*, No. 23-374. The government asked the Court to hold the petition pending resolution of *United States v. Rahimi*, No. 22-915.

*Barber*, 2023 WL 2140526, at *1-3 (D. Alaska Feb. 21, 2023); *United States v. Jackson*, 2023 WL 1965424, at *1-2 (D. Ariz. Feb. 13, 2023); *United States v. Moore*, 2023 WL 154588, at *1-2 (D. Or. Jan. 11, 2023); *United States v. Wondra*, 2022 WL 17975985, at *1-2 (D. Idaho Dec. 27, 2022); *United States v. Serrano*, --- F.Supp.3d ---, ---, 2023 WL 2297447, at *9-10 (S.D. Cal. Jan. 17, 2023); *Walker v. United States*, 2022 WL 16541183, at *3 (S.D. Cal. Oct. 28, 2022).   *United States v. Bacchus*, No. 2:22-CR-450-SVW, Order at 1-3 (C.D. Cal. Feb. 2, 2023), ECF No. 28; *United States v. Smith*, No. 2:19-CR-505-JAK, Order at 3-7 (C.D. Cal. Jan. 19, 2023), ECF No. 183; *United States v. Jacobs*, No. 2:22-CR-160-MEMF, Order at 5-8 (C.D. Cal. Nov. 28, 2022), ECF No. 28; *United States v. Ramos*, No. 2:21-CR-395-RGK, Order at 4 (C.D. Cal. Aug. 5, 2022), ECF No. 31; *United States v. Nevens*, No. 2:19-CR-774, Order at 2-4 (C.D. Cal. Aug. 15, 2022), ECF No. 121; *United States v. Ford*, No. 2:22-CR-200-PA, Order at 1 (C.D. Cal. Sep. 6, 2022), ECF No. 55 (rejecting argument that § 922(g)(1) is unconstitutional in oral ruling); *United States v. Navarro*, ED CR 22-00063-JWH, Order at 1 (C.D. Cal. Jul. 25, 2023), ECF No. 39 (same); *United States v. Butts*, -- F. Supp. 3d --, 2022 WL 16553037 (D. Mont. Oct. 31, 2022); *United States v. Brown*, 2023 WL 7017622, at *4-6 (D. Nev. Oct. 25, 2023); *United States v. Pruitt*, 2023 WL 7114826, at *6 (D. Nev. Oct. 25, 2023); *United States v. Gamble*, --- F.Supp.3d ---, ---, 2023 WL 6460665, at *12 (D. Nev. Oct. 4, 2023); *United States v. Chandler*, 2023 WL 3340872, at *2 n.4 (D. Nev. May 9, 2023); *United States v. Bulltail*, 2023 WL 5458780 (D. Mont. Aug. 24, 2023) (*Vongxay* not clearly irreconcilable with *Bruen*); *United States v. Saba*, 2023 WL 5333255 (D. Id. Aug. 17, 2023) (same); *United States v. Owens*, 2023 WL 5291341 (D. Ak. Aug. 17, 2023) (same); *United States v. Hatch*, 2023 WL 5020270 (S.D. Cal. Aug. 7, 2023) (same); *United States v. Pineda*, 2023 WL 4053583 (D. Or. June 16, 2023) (same); *United States v. Chatman*, 2023 WL 3509699 (N.D. Cal. May 16, 2023) (same); *United States v. Guthery*, 2023 WL 2696824 (E.D. Cal. Mar. 29, 2023) (same); *United States v. Jackson*, 2023 WL 19671099 (W.D. Wa. Feb. 13, 2023) (same); *United States v. Ridgeway*, 629 F.Supp.3d 1027 (S.D. Cal. Sept. 20, 2022) (same).

Similarly, District Courts in other Circuits have also routinely rejected the argument made by Defendant here on the constitutionality of Section 922(g)(1).  *See, e.g., United States v. Collette*, -- F. Supp. 3d --, 2022 WL 4476790 (W.D. Tex. Sep. 25, 2022) (Counts, J.); *United States v. Charles*, -- F. Supp. 3d --, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022) (Counts, J.); *United States v. Coleman*, 2023 WL 122401 (N.D.W. Va. Jan. 6, 2023); *United States v. Siddoway*, 2022 WL 4482739 (D. Idaho Sep. 27, 2022); *United States v. Young*, -- F. Supp. 3d --, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022); *United States v. Gray*, 2022 WL 16855696 (D. Col. Nov. 10, 2022).

### b.  Historical Analysis Showing Section 922(g)(1) is Constitutional.

The historical record demonstrates that the Second Amendment does not prevent Congress from banning firearm possession by felons. Section § 922(g)(1) comports with the Nation's historical tradition of firearms regulation.[5]

#### i.  The Second Amendment Allows Congress to Disarm Persons Who Are Not Law-Abiding, Responsible Citizens

The Second Amendment guarantees an individual right to possess and carry arms for self-defense. But as the Supreme Court has repeatedly emphasized, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *Bruen*, 142 S. Ct. at 2128; *McDonald*, 561 U.S. at 786.  In determining the scope of the right to keep and bear arms, a court should consider the right's history and the Nation's tradition of firearms regulation. *See Bruen*, 142 S. Ct. at 2126. History and tradition establish, for example, that the Second Amendment does not guarantee an unlimited right to possess every kind of weapon; rather, Congress may ban "dangerous and unusual weapons." *Heller*, 554 U.S. at 627.

---

[5] The Supreme Court has under consideration the constitutionality of § 922(g)(8), which prohibits possession of firearms by individuals subject to domestic-violence restraining orders—persons considered irresponsible or dangers, not felons, in *United States v. Rahimi*, No. 22-915. The same historical tradition at issue in *Rahimi* is relevant here. Oral argument in *Rahimi* was held November 7, 2023. Although *Rahimi* concerns a different subsection of § 922, the Supreme Court's decision in that case may provide guidance to this Court's analysis of § 922(g)(1).

1    History and tradition similarly establish that the Amendment does not guarantee an

2    unlimited right to carry weapons everywhere; rather, Congress may ban weapons in

3    "sensitive places." *Bruen*, 142 S. Ct. at 2133.  So too may Congress regulate who may

4    possess weapons in the first place. In particular, the Supreme Court has recognized that

5    Congress may disarm individuals who are not "law-abiding, responsible citizens." *Heller*,

6    554 U.S. at 635. The history of the right to keep and bear arms and the American tradition

7    of firearms regulation confirm that reading.

8            1.  Supreme Court precedents recognize that Congress may

9                disarm persons who are not law-abiding, responsible

10               citizens.

11   As discussed above, *Heller*, *McDonald*, and *Bruen* make clear that the Second

12   Amendment protects only law-abiding, responsible citizens. Many aspects of Second

13   Amendment doctrine rest on this premise. In judging whether a modern firearms regulation

14   is consistent with a historical precursor, a court must ask "how and why the regulations

15   burden a *law-abiding* citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133

16   (emphasis added). In judging whether a weapon is dangerous and unusual, a court must

17   consider whether the weapon is "typically possessed by *law-abiding* citizens for lawful

18   purposes." *Heller*, 554 U.S. at 625 (emphasis added). And States may require applicants

19   for gun permits to pass background checks and take safety courses because such

20   requirements ensure that those who carry guns "are, in fact, '*law-abiding*, responsible

21   citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted) (emphasis added). Those legal

22   principles all reflect the understanding that the Second Amendment allows Congress to

23   disarm persons who are not law-abiding, responsible citizens.

24           2.  History confirms that Congress may disarm persons who

25               are not law-abiding, responsible citizens.

26   The Second Amendment's history illuminates its meaning. *See Bruen*, 142 S. Ct. at

27   2128-2129. Because the Amendment "codified a right inherited from our English

28   ancestors," a court should begin with English law. *Id.* at 2127 (citation omitted). Because

"[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider evidence of how the Founding generation understood the right. *Id.* at 2136 (citation and emphasis omitted). And because evidence of the "public understanding of a legal text in the period after its enactment or ratification" is probative of original meaning, a court should consider how the Second Amendment was understood in the 19th century. *Heller*, 554 U.S. at 605 (emphasis omitted); *see Bruen*, 142 S. Ct. at 2136-2138. Historical evidence from each of those eras— before, at, and after the Founding—leads to the same conclusion: Congress may disarm persons who are not law-abiding, responsible citizens.

a.  Pre-Founding.

The English Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.*

While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It thus did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." 14 Car. 2, c. 3, § 13 (Eng.). Consistent with the Militia Act, the Crown often directed local officials to disarm those whom it did not trust to use weapons responsibly— for instance, those who had "disturbed the public Peace."[6] That practice continued after the

---

[6] Privy Council to Lord Newport (Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, at 156 (1904); *see, e.g., Calendar of State Papers, Domestic Series, Charles II, 1661-1662*, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1, 1684–February 5, 1685*, at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons").

adoption of the English Bill of Rights.[7] Indeed, many 18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[8]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-2142. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, with violations punishable by forfeiture of the weapons.[9] The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

The understanding that the government could lawfully disarm irresponsible subjects remained intact at the time of the American Revolution. For example, in 1780, London officials reacted to widespread rioting by confiscating the rioters' arms. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-131 (1994). The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. *See id.* at 131-132. Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober

---

[7] *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700-8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report*, Appendix, Part IV 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report*, Appendix, Part VI 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

[8] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[9] *See, e.g.*, 4 William Blackstone, Commentaries on the Laws of England 149 (10th ed. 1787); 1 Richard Burn, The Justice of the Peace, and Parish Officer 13-14 (2d ed. 1756); 1 William Hawkins, A Treatise of the Pleas of the Crown 135 (1716).

citizens" or "citizens of character."[10] The press similarly distinguished "the riotous mob" from "citizens of character."[11] And private groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects."[12]

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, that background strongly suggests that the Second Amendment likewise allows Congress to disarm individuals who are not law-abiding, responsible citizens.

b.  Founding era.

Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." In 1780, for example, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). The town explained: "we esteem it an essential privilege to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Law-full Subjects of Government* we Ought Never to be deprived of them." *Id.* (emphasis added).

---

[10] *See, e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

[11] 49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780); *see, e.g.*, 42 The Scots Magazine 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens").

[12] *See* 2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780*, at 139 (1780) (resolutions adopted in York); 1 *The Remembrancer; or Impartial Repository of Public Events, for the Year 1781*, at 24 (1780) (resolutions adopted in Middlesex); id. at 112 (resolutions adopted in Huntingdonshire).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals.*" 2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller*, 554 U.S. at 604. A contemporary commentator, discussing the proposal, agreed that Congress should have the power to disarm individuals who posed a "real danger of public injury." Nicholas Collin, *Remarks on the Amendments to the Federal Constitution . . . by a Foreign Spectator*, No. 11 (Nov. 28, 1788), *in Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* 40 (Stanton D. Krauss ed., 2019).

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). A contemporary described the proposal as an effort to protect "the right of peaceable citizens to bear arms." Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. *Id.*

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope.

*Id.* at 603-605. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

c.  Post-Founding.

Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope. Not every commentator who discussed the right specifically addressed the government's power to disarm certain individuals—just as not every commentator specifically discussed its power to prohibit dangerous and unusual weapons or to bar carrying weapons in sensitive places. But the commentators that did address the issue confirmed that the government may disarm those who are not responsible or law-abiding.

For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Id.* (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the mid-1850s. On the one hand, they supported disarming groups responsible for violence in Kansas. Senator (and future Vice President) Henry Wilson, for instance, complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory

for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856). Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands." *Id.* at 1091. On the other hand, opponents of slavery criticized Kansas authorities for disarming "peaceable" free-state settlers.[13] A petition published in William Lloyd Garrison's newspaper even urged the impeachment of President Pierce for his efforts to disarm "peaceable citizens." A.J. Grover, *Impeachment of Franklin Pierce* (Aug. 1, 1856), *in* The Liberator, Aug. 22, 1856, at 140.

Sources from during the Civil War reflect the same understanding. In 1863, a Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), *in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888). A war memoir recounted a Union soldier's belief that "it was unconstitutional to disarm peac[e]able citizens." *Chickasaw, The Scout*, *in* R.W. Surby, *Grierson Raids* 253 (1865). And after the war, Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men." Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern States sought to disarm Black citizens, prompting "an outpouring of discussion" about the right to keep and bear arms. *Heller*, 554 U.S. at 614. Participants in that discussion affirmed the right to possess arms for self-defense yet cautioned that the right protected only "peaceable" or "well-disposed" citizens. In Georgia, for example, the Freedmen's Bureau issued a circular explaining that "[a]ll men, without distinction of color, have the right to keep arms," but that "[a]ny person, white or black, may be disarmed if convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). The Bureau also

---

[13] *See, e.g.*, New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he . . . violated one of those provisions of the Constitution which a free people should guard with the most jealous care."); *High-Handed Outrage in Kansas*, Holmes County Republican, Oct. 30, 1856, at 1 (denouncing the disarmament of "[p]eaceable American [c]itizens" in Kansas as a violation of their "constitutional rights").

recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms." H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-909.

Commentators continued to interpret the Second Amendment the same way later in the century. One newspaper article argued that "pistols cannot safely be committed to every irresponsible hand," that the Constitution does not protect "the right of every drunken loafer to bear about in his pocket the implements of murder," and that the right instead belongs only to those "whom it was safe to trust with firearms." *The Sale of Pistols*, New York Times, June 22, 1874, at 4. Another article referred to the "constitutional right of every peaceable citizen to carry arms for his own defense." *Kansas Legislature: Some Criticisms on Pending Bills*, The Topeka Daily Capital, Feb. 2, 1883, at 6.

All in all, post-ratification sources point in the same direction as English and Founding Era sources. Although different commentators used different terms— "peaceable," "well-disposed," and so on—they recognized that a legislature could disarm those who were not law-abiding, responsible citizens.

3.  The Nation has a long tradition of disarming persons who are not law-abiding, responsible citizens.

"[T]his Nation's historical tradition of firearm regulation" further illuminates the Second Amendment's scope. *Bruen*, 142 S. Ct. at 2126. And the United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming persons whom legislatures have found are not law-abiding, responsible citizens.

Most relevant here, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for example, the Continental Congress recommended, and most States enacted, laws disarming

loyalists and others who refused to swear allegiance to the new Republic.[14] Similarly, after putting down Shays' Rebellion in 1787, Massachusetts required the rebels, as a condition of being pardoned, to surrender their arms, which would be returned to them after three years if they kept the peace.[15]

Colonies and early States also punished irresponsible use of arms with forfeiture of the arms. Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 5 Pet. 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[16] Some 17th- and 18th-century American statutes expressly recodified that rule.[17] Others made forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[18] Although

---

[14] *See* 4 *Journals of the Continental Congress 1774-1789*, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

[15] *See* Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

[16] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[17] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[18] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652,

those laws involved forfeiture of arms involved in an offense, rather than bans on possessing arms, they show that legislatures could restrict an individual's ability to bear arms if his conduct suggested that he would not use them responsibly.

A few decades later, States began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes). Those laws, too, confirm that irresponsible individuals were subject to special restrictions that did not (indeed, could not) apply to ordinary, law-abiding citizens. *See id.* at 2122 (holding a proper-cause requirement unconstitutional as applied to ordinary citizens).

Continuing in the 19th century, as guns became more lethal and more widely available, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages.[19] Several States banned the

---

*Laws and Ordinances of New Netherland*, 1638-1674, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, §1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

[19] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896

sale of guns to persons of unsound mind.[20] At least a dozen States disarmed "tramps"—that is, vagrants.[21] Some States forbade intoxicated persons from buying or carrying guns.[22] One State forbade the carrying of arms by "any person who has ever borne arms against the government of the United States."[23] Another disarmed certain individuals in identified categories if they were "not known to be peaceable and quiet persons."[24]

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468,469 (1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (1900).

---

Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[20] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[21] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[22] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

[23] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.

[24] *See* Act of Apr. 30, 1855, §§ 1-2, in 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

The tradition of disarming unfit persons continued into the 20th century. In the 1930s, Congress disqualified violent criminals, fugitives from justice, and persons under felony indictment. *See* Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251. In the 1960s, Congress disqualified felons in general, drug users and addicts, and persons with mental illnesses. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220. In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452. And in the 1990s, Congress disarmed persons subject to domestic-violence protective orders, *see* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401(c), 108 Stat. 2014, and domestic-violence misdemeanants, *see* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f) [tit. VI, § 658(b)(2)], 110 Stat. 3009-372. That series of statutes reflects Congress's longstanding judgment that "firearms must be kept away from persons . . . who might be expected to misuse them." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983).

From the earliest days of the Republic to modern times, in short, legislatures have disarmed individuals who could not be trusted with firearms. Different legislatures have disarmed different groups at different times: loyalists and rebels in the 18th century; under-age individuals and persons of unsound mind in the 19th century; and felons, drug addicts, and domestic abusers in the 20th century. But those disqualifications all reflect the same enduring principle: The Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens.

ii.   Section 922(g)(1) Complies with the Second Amendment.

As set forth above, the Nation has a lengthy historical tradition of disarming individuals who are not law-abiding, responsible citizens. Section 922(g)(1), which prohibits possession of firearms only by people convicted of serious crimes—i.e., those

punishable by imprisonment for more than one year—is entirely consistent with that tradition.

First, felons do not fall within "the people" protected by the Second Amendment, a term that *Heller* said refers to "members of the political community." *Heller*, 554 U.S. at 580. From the founding to the present, legislatures historically retained wide latitude to exclude felons from the political community. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *id.* at 616, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868); *see also Kanter v. Barr*, 919 F.3d 437, 446 n.6 (7th Cir. 2019). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *Cooley*, *supra*, at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998).

This remains true today. "The commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019); *see also United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (noting in a § 922(g)(1) case that felons also "lose out on fundamental rights such as voting and serving on juries, and face discrimination that need only survive rational basis review"). This reality aligns with this Court's view that "most scholars of the Second Amendment agree that the right to bear arms was inextricably tied to the concept of a 'virtuous citizenry' that would protect society through defensive use of arms against criminals, oppressive officials, and foreign enemies alike, and that the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)." *Vongxay*, 594 F.3d at 1118 (cleaned up).

Contrary to Defendant's contention (Doc. 41 pp. 5-6), the term "people" need not have the same meaning in the Second Amendment that it does in the First and Fourth Amendments. When discussing the ambit of the Second Amendment, the Supreme Court initially described the right as belonging to "all members of the political community." *Heller*, 554 U.S. at 580. But the Court made this comment in the context of concluding that the Amendment confers "an 'individual right,' unrelated to service in militia." *United States v. Torres*, 911 F.3d 1253, 1259 (9th Cir. 2019) ("[T]he *Heller* decision did not resolve who had the Second Amendment right; *Heller* resolved if there were an individual right per se under the Second Amendment." (Emphasis in original)). As described above, the Court went on to define the right as belonging to "law-abiding, responsible citizens," *id.* at 635, and repeated that definition in *Bruen*, *e.g.*, 142 S. Ct. at 2122, 2156. Defendant, in effect, wants this Court to ignore the Supreme Court's consistent interpretation of the right to bear arms as one belonging to "law-abiding" citizens, but neither *Heller* nor *Bruen* provides any basis for doing so.

Second, the historical severity of punishments for felony offenses supports the conclusion that disarmament of felons as a class is consistent with the Nation's historical tradition. For centuries, felonies have been "the most serious category of crime," *Medina*, 913 F.3d at 158, resulting in "forfeiture of property and rights," *Mai*, 974 F.3d at 1093 (dissent). In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98 (capitalization omitted).

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) around the time of the founding. *See Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020) (discussing history of felony punishments). Capital punishment for felonies was "ubiquit[ous]" in the late

eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes) (noting that statutes calling for a forfeiture of estate upon conviction "were in vogue" during the Revolutionary war).

The "widespread, continued condemnation of felons, including those who committed non-violent offenses, to death demonstrates that in 1791 Americans understood felons, as a group, to commit serious crimes." *Folajtar*, 980 F.3d at 905.  It is also compelling evidence that "framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1587 (2022). Thus, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

1.  Disarmament was not even historically limited to "violent" or "dangerous" individuals.

The historical record demonstrates that disarmament was not even limited to "violent" or "dangerous" felons. *See Folajtar*, 980 F.3d at 908-10 (reviewing historical evidence and concluding that such disqualification was not limited to dangerousness); *Medina*, 913 F.3d at 159 ("The historical evidence and the Supreme Court's discussion of felon disarmament laws leads us to reject the argument that non-dangerous felons have a right to bear arms.").

In England, Parliament's authority to disarm classes of people who (in its view) could not be depended upon to obey the law was well established. As noted above, in 1689, the same Parliament that "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593), also passed an "Act for the better secureing the Government by disarming Papists and reputed Papists," 1 W. & M., Sess. 1, ch. 15, 6 Statutes of the Realm 71. That Act provided that any Catholic who refused to make a declaration renouncing his faith could not "have or keepe in his House or elsewhere" any "Arms Weapons Gunpowder or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.* at 72.

The American colonies enacted similar laws. For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotation marks omitted). And during the French and Indian War, Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath. *See* 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. law). Like the English law discussed above, the Virginia statute tied disarmament to failure to take a loyalty oath and exempted those who took the oath. *Id.* at 38. Maryland and Pennsylvania similarly confiscated firearms from Catholics. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

To be sure, such specific status-based regulations of this period are repugnant[25] (not to mention unconstitutional). But the fact that they would run afoul of the First or Fourteenth Amendments, which did not yet exist, does not alter the conclusion that the "pre-existing right" codified in the Second Amendment, *Heller*, 554 U.S. at 592, allowed legislatures the power and discretion to use status as a basis for disarmament even of

---

[25] Described as "odious" by the Solicitor General during oral arguments in *United States v. Rahimi*, No. 22-915, November 7, 2023.

1   nonviolent groups.

2          Similarly, during the Revolutionary War, American legislatures passed numerous

3   laws disarming non-violent individuals because their actions evinced an unwillingness to

4   comply with the legal norms of the nascent social compact—often specifically targeting

5   those who failed to demonstrate loyalty to the new American government. *Folajtar*, 980

6   F.3d at 908 ("[O]ther colonies did not require violence or dangerousness for

7   disarmament."). An early example is a 1775 Connecticut law providing that any person

8   convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or

9   the Connecticut General Assembly "made for the defence or security of the rights and

10  privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms."

11  *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993

12  (1890) (1775 Conn. law). And in 1776, the Continental Congress recommended that the

13  colonial governments disarm those who were "notoriously disaffected to the cause of

14  America" or who simply "have not associated" with the colonial governments in the war

15  effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of

16  March 14, 1776). At least six of the governments enacted legislation in this vein—

17  disarming the "disaffected" who refused to take an oath of allegiance to those states. *See,*

18  *e.g.*, 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts*

19  *Bay* 479-84 (1886) (1776 Mass. law).

20         Pennsylvania's statute offers a particularly clear rebuttal to the claim that only

21  dangerous felons could be disarmed. Pennsylvania's state constitution protected the

22  people's right to bear arms, *see Heller*, 554 U.S. at 601, but its statute nonetheless provided

23  that all white males over eighteen must swear to "be faithful and bear true allegiance to the

24  commonwealth of Pennsylvania as a free and independent state," and that those who failed

25  to take the oath—regardless of dangerousness or propensity for physical violence—"shall

26  be disarmed" by the local authorities. 9 *The Statutes at Large of Pennsylvania from 1652-*

27  *1801*, 110, 111, 112-13, § 3 (William Stanley Ray ed., 1903). Pennsylvania thus deprived

28  sizeable numbers of pacifists of the right to bear arms, because oath-taking violated

Quakers' and others' religious convictions. *See* Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006)). Quakers were not suspected of possible rebellion. *See Heller*, 554 U.S. at 590 ("Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever."); *cf. Folajtar*, 980 F.3d at 908, n.11 (explaining "[r]efusing to swear an oath" does not "qualify as dangerous").

In sum, the disarmament measures adopted during the Republic's early period reflect that legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms.

Finally, the ratification debates leading up to the enactment of the Constitution confirm this understanding that legislatures had the power to disarm groups that could not be trusted to follow the law. Specifically, three of the thirteen states proposed amendments "limiting the right to bear arms to both law-abiding and 'peaceable' citizens." *Folajtar*, 980 F.3d at 908 (emphasis in original); *see also Medina*, 913 F.3d at 159. In Pennsylvania, and as noted above, the Antifederalists proposed a constitutional amendment providing that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." Schwartz, *supra*, at 665 (emphasis added, reproduced at *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting)).  Again, that illustrates the founding generation's recognition that "crimes committed"—violent or not—could supply an independent ground for a legislature to prohibit firearm possession.  *See, e.g.*, *Medina*, 913 F.3d at 158-59 ("The use of the word 'or' indicates that criminals, in addition to those who posed a 'real danger' . . . were proper subjects of disarmament.").  Similar proposals were adopted at the ratifying conventions of Massachusetts and New Hampshire. 2 Schwartz, *supra*, at 675, 681, 758, 761.

The fact that the Second Amendment did not adopt the wording of those proposals does not undermine their significance. To the contrary, their significance, as *Heller* explained, lies in revealing the nature of the right as it was understood at the time.  *See* 554

U.S. at 604 (relying on the Pennsylvania, Massachusetts, and New Hampshire proposals to conclude that they "plainly" and "unequivocally referred to individual rights"). Not all limitations are explicit.  *See, e.g.*, *id.* at 635 ("obscenity, libel, and disclosure of state secrets," fall outside the scope of the First Amendment).  It would have been "'obvious'" to the founders that certain groups, including (but not necessarily limited to) "'the felon,'" *Kanter*, 919 F.3d at 446 n.6 (quoting Cooley, supra, at 29), could properly be subject to disarmament laws consistent with the "pre-existing right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127. *See also Heller*, 554 U.S. at 592; Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood").

> iii.   Section 922(g)(1) is relevantly similar to historical laws regulating firearms.

The historical laws discussed above demonstrate § 922(g)(1)'s constitutionality. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791," and explained that courts should "reason[] by analogy—a commonplace task for any lawyer or judge." *Bruen*, 142 S. Ct. at 2132. A court should ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Put another way, the "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133 (emphasis and quotation marks omitted).

Under the first metric, § 922(g)(1) imposes no "burden [on] a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. "[C]onviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir.

2017). Moreover, the burden imposed on the felon's rights is comparable to historical laws disarming the untrustworthy and less severe than many historical felony-punishment laws, which often included the death penalty and forfeiture of one's property.

Furthermore, the modern and historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical laws sought to punish felons and deter re-offending, as well as to protect society from the untrustworthy. Section 922(g)(1) serves a more limited but equally justified purpose. It seeks to protect society from gun violence committed by felons, who have previously shown disregard for society's laws and are more likely to reoffend potentially in dangerous ways.

*Bruen* emphasized that the government need only identify a "historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* As explained above, § 922(g)(1) and the historical laws are "relevantly similar," *id.* at 2132, because the historical laws imposed severe consequences on the commission of a felony and authorized legislatures to disarm untrustworthy people.

Moreover, the lack of an identical historical statute does not suggest that the founding generation would have viewed § 922(g)(1) as violating the Second Amendment. As one district court recently observed, a "list of the laws that happened to exist in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (emphasis in original). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority.

In discussing how courts should proceed with evaluating whether a modern firearm restriction is consistent with the Second Amendment's text and history, the Court in *Bruen* stated that, in some cases, the inquiry would be straight-forward—"[f]or instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th

century, the lack of a distinctly similar historical regulation addressing the problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. The Court did not define "general societal problem" or "distinctly similar," but in any event, the Court did not lay out a "dual-track" standard with a stricter test for statutes aimed at long-standing problems. Instead, the Court was merely providing examples of how its historical test might apply. Despite *Bruen* itself involving a statute aimed at a long-standing issue—public carry—the opinion never again mentions a "distinctly similar" requirement separate from the "analogical reasoning" discussed at length. *Id.* at 2132-33. But even if the Court did establish sub silentio two different tests, § 922(g)(1) satisfies the stricter one because the statutes discussed above— disarming those who were not law-abiding, responsible citizens—are distinctly similar to the current felon disarmament provision, which simply places a clearly limited definition on who may be disarmed for committing serious crimes.

In sum, § 922(g)(1) comports with the nation's historical tradition of firearm regulation; Defendant cannot show that § 922(g)(1) is unconstitutional.

### c. The Second Amendment does not protect possession of an unregistered dangerous weapon.

It is well established that the Second Amendment does not protect possession of short-barreled rifles, and nothing in *Bruen* says otherwise.  The plain text of the Second Amendment does not guarantee an unequivocal right to possess a short-barreled rifle. Over 80 years ago, in *United States v. Miller*, the Supreme Court determined that the plain text of the Second Amendment does not guarantee a right to possess a short-barreled rifle, stating that "we cannot say that the Second Amendment guarantees the right to keep and bear" an unregistered sawed-off "shotgun having a barrel of less than eighteen inches in length." 307 U.S. 174, 175-78 (1939); *Heller*, 554 U.S. at 625 (reading *Miller* to say that

the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").[26]

To support his argument that possession of a short barrel rifle is protected by the Second Amendment, Defendant cites to *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023).

> And "arms" includes "all firearms." *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023). It is "irrelevant" whether a given firearm "has military value" or "[was] in existence at the time of the founding." Id. Rather, "all instruments that constitute bearable arms" get the Amendment's protections. *Id.* (quotations omitted). That definition equally covers a firearm with a shorter-than-18-inch barrel; such an arm is part of "all firearms." *See id.* Possessing such a firearm is thus conduct protected by the plain text of the Amendment. See id. (Doc. 41 at 6-7).

*Teter v. Lopez*, however, was subsequently vacated on February 22, 2024 (before Defendant filed the instant motion on March 4, 2024). *See* 2024 WL 719051. Contrary to Defendant's assertion, possession of a short-barreled rifle is not grounded in this country's historical tradition. *Heller* held that the Court's reading in *Miller* -- that the Second Amendment protects only the "sorts of weapons" that were "in common use at the time" and does not protect "the carrying of dangerous and unusual weapons" -- "accords with the historical understanding of the scope of the right." *Id.*

*Bruen* expressly endorsed *Miller* and *Heller* and thus does not call for a different conclusion. 142 S. Ct. at 2143; *see also id.* at 2162 (Kavanaugh, J., concurring). Indeed, *Bruen* reiterated that there is no "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626); *see also United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018) (noting that a long gun with a shortened barrel is both dangerous, because "its concealability fosters its use in illicit activity," and unusual, "because of its heightened capability to cause damage." (*quoting United States v. Marzzarella*, 614 F.3d 85, 95 (3d. Cir. 2010))).

---

[26] 26 U.S.C. § 5845(a)(3) defines a "[f]irearm" to include "a rifle having a barrel or barrels of less than 16 inches in length."

1    Further, Section 5861(d) is not a blanket prohibition on firearms, but rather codifies
2    the registration regime under the National Firearms Act NFA's for certain types of
3    firearms, including the short-barreled rifle at issue in this case. *See Cox*, 906 F.3d at 1179
4    (discussing at length the National Firearms Act taxation and licensing scheme for short-
5    barreled weapons). *Bruen* did not undermine this regime; rather, *Bruen* specifically
6    approved of licensing regimes for carrying firearms, so long as those regimes are open to
7    ordinary, law-abiding citizens. 142 S. Ct. at 2161 (Kavanaugh, J., concurring). Here,
8    Section 5861(d) does not require "demonstrating to government officers some special
9    need" to possess a short-barreled rifle in the discretionary manner that *Bruen* held
10   unconstitutional. 142 S. Ct. at 2156.

11   Finally, courts around the country, including courts in the Ninth Circuit, have
12   similarly rejected challenges to prosecutions under Section 5861(d) for possessing
13   unregistered dangerous weapons. *See, e.g., United States v. McCartney*, 357 F. App'x 73,
14   76 (9th Cir. 2009) (holding that silencers are not protected by the Second Amendment);
15   *United States v. Grey*, No. 18-CR-00412-CAS-1, 2018 WL 4403979, at *13 (C.D. Cal.
16   Sept. 13, 2018)(holding that the registration requirement does not violate the Second
17   Amendment); *see also United States v. Miller*, 11 F.4th 944, 955 (8th Cir. 2021) (rejecting
18   challenge to NFA's prohibition of short-barreled shotguns); *United States v. Wilson*, 979
19   F.3d 889, 903 (11th Cir. 2020) (rejecting challenge to 26 U.S.C. §§ 5861(d) and 5871,
20   prohibiting possession of unregistered sawed-off shotgun, as barred by *Miller*); *United*
21   *States v. Royce*, No. 1:22-CR-130, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023)
22   (holding that short-barreled rifles and shotguns are "'dangerous and unusual' weapons that
23   are easily concealable and thus not protected by the Second Amendment"); *United States*
24   *v. Rush*, No. 22-cr-40008-JPG, 2023 WL 403774, at *3 (S.D. Ill. Jan. 25, 2023) (similar).

25   Defendant's conduct, therefore, falls outside the Second Amendment's protections.
26   The plain text does not guarantee defendant the right to possess a short-barreled rifle and
27   such a prohibition, as set forth in Section 5861(d), is well within the "historical tradition of

28

prohibiting the carrying of 'dangerous and usual weapons.'"   *Heller*, 554 U.S. at 627. *Bruen* does not change that result.

### Conclusion

For all of these reasons, Defendant's second motion to dismiss the Indictment should be denied.

Respectfully submitted this 18th day of March, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

s/David A. Pimsner
s/Abbie Broughton Marsh
DAVID A. PIMSNER
ABBIE BROUGHTON MARSH
Assistant U.S. Attorneys

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Certificate of Service

I hereby certify that on March 18, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Mark Rumold.

*s/Eric Allen*
U.S. Attorney's Office