JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

MARK RUMOLD, Cal. Bar #279060
Asst. Federal Public Defender
Attorney for Defendant
mark_rumold@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>   Plaintiff,<br><br>  vs.<br><br>Donald Day, Jr.,<br><br>   Defendant. | CR-23-8132-PCT-JJT<br><br>**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO DISMISS SUPERSEDING INDICTMENT** |

   Defendant Donald Day, Jr. ("Mr. Day"), through undersigned counsel, respectfully replies to the government's response to Mr. Day's second motion to dismiss the superseding indictment. (Doc. 50.)

   Respectfully submitted:   March 25, 2024.

            JON M. SANDS
            Federal Public Defender

            */s/ Mark Rumold*
            Mark Rumold
            Asst. Federal Public Defender

### MEMORANDUM OF LAW

The government's response (Doc. 50) ("Resp.") argues principally that Ninth Circuit precedent forecloses Mr. Day's challenges both to 18 U.S.C. § 922(g)(1) and 26 U.S.C. § 5681(d). With respect to 18 U.S.C. § 922(g)(1) only, it argues in the alternative that the law is consistent with the nation's historical tradition of firearms regulation. Resp. at 3. These arguments are misplaced for the reasons set forth in Mr. Day's motion to dismiss and as further elaborated below.

**I.    *Bruen* abrogated prior caselaw declaring the challenged statutes constitutional.**

**A. *Bruen* abrogated *Vongxay* with respect to § 922(g)(1)**

The government's reliance on *Vongxay* and other pre-*Bruen* case law upholding 8 U.S.C. § 922(g)(1) is misplaced. A Supreme Court decision can abrogate lower court precedent in two ways: (1) through its express holding, or (2) through its "reasoning or theory" or "mode of analysis." *Miller v. Gammie*, 335 F.3d 889, 900 (2003) (quoting Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U. Chi. L.Rev. 1175, 1177 (1989)). Here, *Bruen*'s "reasoning" and "mode of analysis" is that courts must declare unconstitutional any conduct falling within the plain text of the Second Amendment that is not consistent with the Nation's historical tradition. *See* 142 S. Ct. at 2129–30. Thus, while *Bruen*'s express holding overruled cases employing means-ends scrutiny, its mode of analysis abrogates *any* case upholding a gun law without full textual and historical review.

The government claims that *Vongxay* "fulfilled the *Bruen* court's text and history analysis directives," but it provides no support for that proposition, nor is any to be found in *Vongxay* itself. Indeed, *Vongxay* quotes language from *District of Columbia v. Heller* admitting that it was not "not undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment" or applying any such methodology to the "presumptively lawful categories." *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (quoting *Heller*, 554 U.S. 570, 626 & n.26 (2008)). Thus, *Heller*'s incomplete

analysis merely confirms that *Vongxay* is "clearly irreconcilable" with *Bruen*. *Miller*, 335 F.3d at 900.

*Bruen*'s treatment of concealed carry confirms that—contrary to *Vongxay*— *Heller*'s preliminary assertions are subject to testing and revision. In *Heller*, the Court tentatively interpreted the historical record to mean that "prohibitions on carrying concealed weapons are lawful." *Heller*, 554 U.S. at 626. But in *Bruen*, the plaintiffs claimed that a New York law prohibiting most concealed carry was unlawful. *Bruen*, 142 S. Ct. at 2122. If *Heller*'s preliminary conclusions were dipositive and unassailable, this claim would have been rejected without further analysis. Instead, however, the Court performed a full historical analysis, then held that the "[concealed carry] licensing regime violate[d] the Constitution." *Id*. Thus, *Bruen*'s final holding (deeming a concealed carry prohibition unlawful) revised *Heller*'s tentative assertion ("prohibitions on carrying concealed weapons are lawful") after a full review.

Finally, *Bruen*'s "law-abiding" and "presumptively lawful" language do not alter these conclusions. These phrases are not part of *Bruen*'s holding or reasoning. They are legal asides delineating unresolved questions not presented. Thus, it is *Bruen*'s plain text and historical *methodology*—not its "law-abiding" and "presumptively lawful" language—that binds lower courts.

B. ***Miller*'s holding regarding short-barreled shotguns is, at a minimum, inapposite.**

The only argument the government advances in support of the constitutionality of the prohibition on the unregistered possession of short-barreled firearm is reliance on the 85-year-old *United States v. Miller*, 307 U.S. 174 (1939). Resp. at 34–37. That case held, "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* at 178. It is therefore, at a minimum, inapposite, as Mr. Day is not claiming a right to

possess such an instrument for purposes of preservation of a well-regulated militia. As relevant here, *Miller* did not address whether such weapons could be possessed for purposes of self-defense in one's home.

Regardless, *Heller* and *Bruen*'s methodology has supplanted *Miller*'s focus on whether a particular weapon "has some reasonable relationship to the preservation or efficiency of a well-regulated militia." *Id.* Under *Bruen*, the Second Amendment applies to "arms in existence in the 18th century" and to "modern instruments that facilitate armed self-defense." 142 S.Ct. at 2132. As Mr. Day discussed in his Motion, short-barreled rifles have unquestionably existed since the 18th century. Mot. at 7–8. And the government does not even attempt to show that there is *any* historical tradition of prohibiting the possession of, or requiring registration of, such weapons. Resp. at 34–38.[1]

The government bears the burden of showing the restriction on the possession of unregistered, short-barreled firearms is consistent with Nation's historical tradition of firearm regulations. *Bruen*, 142 S. Ct. at 2129. The government has abandoned that obligation here. Accordingly, Count 4 should be dismissed.

## II.    The government fails to show that § 922(g)(1) is part of the Nation's historical tradition of firearms regulation.

The first portion of the government's argument that § 922(g)(1) is consistent with the nation's tradition of firearms regulation, Resp. at 13–14, amounts to a reliance on dicta in *Heller* and *Bruen* that is, for the reasons explained above, unavailing. *See* Section I.A., *supra*.

When it attempts to engage with the relevant history, the government's response merely demonstrates how inadequate that history is to a justification of the full-scale bans of the sort at issue in this case. The government does not even attempt to identify a single

---

[1] Mr. Day acknowledges that after he drafted his motion, but before it was filed, the Ninth Circuit granted the government's motion for review en banc of *Teter v. Lopez*, 76. F. 4th 938 (9th Cir. 2023). As the Court is no doubt aware, case law in this area is rapidly developing and changing by the day.

founding-era law that banned individuals with felony convictions from owning guns for life, or that banned possession of firearms with shortened barrels. Unable to cite sufficiently similar enacted historical regulations, the government turns to three proposed restrictions on the right to bear arms from the state ratification conventions. Resp. at 16–19.

Not one of those regulations made it into the Second Amendment's text.

But even if one considers the proposals on the merits, they do not help the government. For example, New Hampshire's proposal would have disarmed only those who "are or have been in *actual rebellion*." *Kanter v. Barr*, 919 F.3d 437, 455 (7th Cir. 2019) (Barrett, J., dissenting). Actual "rebellion" meant "traiterous taking up arms, or a tumultuous opposing the authority of the king, etc. or supreme power in a nation." *Id*. (quoting *Rebellion*, 2 *New Universal Etymological English Dictionary* (4th ed. 1756)). That is a far cry from disarming anyone ever convicted of any felony. *See* § 922(g)(1).

Samuel Adams' proposal in Massachusetts, meanwhile, would have limited the right to bear arms to the "peaceable." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). But even that does not sweep "so broadly that it encompasses all criminals, or even all felons." *Id*. "'[P]eaceable' was defined as '[f]ree from war; free from tumult'; '[q]uiet; undisturbed'; '[n]ot violent; not bloody'; '[n]ot quarrelsome; not turbulent.'" *Id*. (quoting 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773)). Breachers of the peace did not merely commit a crime, but violated "the public peace, as by a riot, affray, or any tumult which is contrary to law, and destructive to the public tranquility." *Id*. (citation omitted). Plus, under common practice at the time, such people had a right to possess guns for self-defense. *See* Mot. 18 n.6.

Pennsylvania's proposal might be interpreted to prevent *anyone* convicted of *any* crime (even misdemeanors) from bearing arms. *See Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). But, at some point, common sense prevails. For reasons given in the motion, that interpretation cannot be squared with Founding-era American practice. *E.g.*, *id.* Thus,

5

"it seems best to read [Pennsylvania's proposal] as contemplating disarmament not for any crime committed—wildly overbroad even by current standards—but for crimes demonstrating that a person poses a 'real danger of public injury.'" C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Policy 695, 729 (2009); Whatever the "Pennsylvania minority's" influence, a questionable interpretation of a rejected proposal cannot trump text and practice.

The government's citation to English law fares no better, as the cited regulations are insufficiently similar to justify a present complete and total ban on possession of firearm by felons. England, before the Founding, did not ban felons from ever again possessing a firearm. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); Marshall, *supra*, at 717 (2009); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020). To the extent that England sought to disarm various individuals, those regulations usually required a more culpable mental state and made exceptions for self-defense, both features absent from § 922(g)(1). In other words, they are not "distinctly similar" to modern felon-in-possession laws. *See Bruen*, 142 S. Ct. at 2131

For example, it was a crime under the common law to "go[] armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)). But by its plain terms, that offense did not make every person the townspeople found scary a criminal. The common law required that "the crime shall appear to be malo animo, [that is,] with evil intent or malice." *Id.* (quoting *Rex v. Sir John Knight*, 1 Comb. 38, 38–39, 90 Eng. Rep. 330 (K. B. 1686)). In other words, the bearer had to have "the intent to cause terror in others." *Id.* at 2183 (Breyer, J., dissenting) (describing majority's view). That is a much more culpable mental state than § 922(g)(1)'s "knowingly." *See* 18 U.S.C. § 924(a)(8).

Second, when England tried to minimize *prospective* use of firearms by those considered dangerous, it was through sureties, not mass disarmament. Marshall, *supra*, at

6

717. A justice of the peace could demand that someone for "whom there is probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance to the public, that such offence as is apprehended shall not happen; by finding pledges and securities for keeping the peace, or for their good behaviour." *Id.* (quoting 5 William Blackstone, *Commentaries* *386–87 (St. George Tucker ed., 1803) (1767)); *see also* William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) (citing 1 W. Hawkins, *Pleas of the Crown* 60 (1716); 3 Sir Edward Coke, *Institutes of the Laws of England* 160 (1644)). But unlike § 922(g)(1), surety laws still presumed that a person could have arms. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); Marshall, *supra*, at 716–23; Greenlee, *supra*, at 260. In other words, the regulation targeted a different class (the violent, not the felonious) and used a different enforcement mechanism (sureties not imprisonment).

Third, to the extent that England tried to disarm whole classes of subjects, it did so on noxious grounds—and still permitted those targeted to keep arms for self-defense. For example, in the age of William and Mary (both Protestants), Catholics were presumed loyal to James II (a catholic trying to retake the throne) and treasonous. Thus, Catholics could keep "Arms, Weapons, Gunpowder, [and] Ammunition," only if they declared allegiance to the crown and renounced key parts of their faith. *See Bruen*, 142 S. Ct. at 2142 n.12 (2022) (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)); *see also* An Act for the more effectuall preserving the Kings Person and Government by disableing Papists from sitting in either House of Parlyament, 1 Charles II stat. 2, in 5 Stat. of the Realm at 894–96 (1678). Yet a Catholic could still "keep 'such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defence of his House or Person.'" *Bruen*, 142 S. Ct. at 2142 n.12 (omissions in original) (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). In other words, even when England assumed that Catholics were engaged in mass treason, they still had "a right to

7

own arms for personal defense." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994).

Moreover, such regulations as did exist were temporary rather than permanent in nature. For example, following Shay's Rebellion in 1787, Resp. at 22, Colonial and Founding-era practice also suggests that committing a serious crime did not result in a permanent disarmament. As the response acknowledges, after the participants in Shay's Rebellion attacked courthouses, a federal arsenal, and the Massachusetts militia, they were barred from bearing arms, *for three years*. In fact, Massachusetts law required the Commonwealth to hold *and then return* the rebels' arms after that period. Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893). In other words, one of the first states punished people involved in one of the most serious violent crimes—armed rebellion—with a three-year firearm ban and a promise to return the weapons used to attack the new government. This is simply insufficiently analogous to justify the kind of full-scale prohibition present in § 922(g)(1).

Lastly, the government's citation to case law from the mid-1800s, Resp. at 19–21 is irrelevant, as it comes almost 100 years after the founding era.

**III.    Conclusion**

Counts 3 and 4 of the indictment must be dismissed.

Respectfully submitted:        March 25, 2024.

JON M. SANDS
Federal Public Defender

 /s/ *Mark Rumold*
Mark Rumold
Asst. Federal Public Defender