**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-23-08132-PCT-JJT |
| Plaintiff, | |
| v. | |
| Donald Day, Jr., | |
| Defendant. | |

At issue is Defendant's Motion *in Limine* Re: Wieambilla Shooting (Doc. 121, "Mot."), to which the Government has filed a Response in opposition (Doc. 129, "Resp."). The Court held oral argument on the Motion on March 25, 2025, and allowed the Government to file a supplemental response (Doc. 147). The Court will grant in part and deny in part the Motion.

Defendant asks the Court to restrict at trial the admission of evidence about Gareth and Stacy Train ("the Trains") and a series of violent confrontations that took place on their property in Wieambilla, Queensland, Australia on December 12, 2022. The following background is relevant to the Motion.

The Trains lived on a very large and isolated rural property in Wieambilla. But while physically isolated, the Trains were active on social media in communicating with other interested persons about their religious, social and political beliefs, including their extreme distrust of government, law enforcement and authority in general, and their willingness or desire to engage same with force. The Government has produced in discovery a number of

such communications with other interested individuals, including, in the year to 18 months leading up to the events at issue, scores of video and text communications between the Trains and Defendant. In those communications, which the Government describes as "numerous, lengthy and frequent," Defendant and the Trains shared their philosophies, including their disdain for and, as the Government put it, "desire to confront," law enforcement.

On December 12, 2022, four Queensland Police Services constables went to the Trains' property on a service call on a missing persons report. Nathaniel Train, Gareth's brother, had been reported missing by his wife, and was in fact with the Trains at that time. Upon the constables' entry onto the Trains' property, the Trains shot and killed two of the constables. Thereafter a neighbor entered upon the property to investigate the disturbance, and the Trains shot and killed him as well. Australian law enforcement responded in force later that evening, and in the second armed confrontation, the Trains and Nathaniel were all killed. Several days later on December 16, 2022, Defendant posted the video recording that the Government charged in Count I of the Indictment, which it alleges constitutes a threat to kill any law enforcement who would enter onto his Heber, Arizona property.

The Government seeks to introduce at trial evidence involving the December 12, 2022 incident at the Trains' property, including some of the communications between Defendant and the Trains before and during that day, testimony from Australian law enforcement about the confrontation and killings that occurred there, and photographs and descriptions of features of the property. Specifically, the Government seeks to offer: 1) testimony and exhibits from two Australian officers as to the fact and limited circumstances of the killings at the Trains' property on December 12 (Exh. 2, Resp. at 6); 2) testimony and exhibits from three other Australian forensic officers as to electronic communications between the Trains and Defendant that the officers retrieved from the Trains' phones or other electronic communication devices,[1] as well as testimony and exhibits from an FBI

---

[1] The government proffered in response to the Court's inquiry that two of those three witnesses would testify only to their forensic recovery steps; only the third witness would introduce the content of the recovered digital evidence.

Computer Analysis and Response Team (CART) agent on his recovery of some digital communications between the Trains and Defendant through sources in the United States (Exhs. 1, 9-17, Resp. at 6-7); and 3) photographic exhibits of features of the Trains' property to include "hides" or tactical sites and surveillance locations and aids (Exhs. 3-8, Resp. at 6).

Defendant states that he understands the Government may refer to Wieambilla to provide context for its allegation in Count I in terms of why United States law enforcement reviewed his postings (Mot. at 8), but asks the Court to limit that evidence to avoid unfair prejudice to him, primarily in the form of a jury implying his guilt by association with the Trains, first for the murders of the constables and their neighbor, and secondly for the counts charged in the Indictment against him through a theory of propensity. Defendant also urges that the Wieambilla killings are simply inflammatory by their very nature, and that much of the evidence the Government seeks to offer, including showing or discussing physical similarities of the Trains' property and its features to that of Defendant's Heber property, similarities between the way the Trains and Defendant lived, and similarities in their beliefs, is not relevant to the elements of Count I. Resting his arguments on FREs 401, 403 and 404, Defendant asks the Court to limit any evidence or discussion of the Wieambilla shootings and the Trains to the following statement:

> On or around December 2022, Gareth, Nathaniel, and Stacey Train were individuals living in Queensland, Australia. They maintained a YouTube account, through which they sometimes exchanged videos, comments, or otherwise communicated with Mr. Day. Mr. Day never met the Trains in person. Mr. Day referred to Nathaniel and Stacey Train as "Daniel" and "Jane."
>
> On December 12, 2022, the Trains were involved in a shootout with police at their home in Queensland. After the shootout, they posted a video to YouTube exhorting viewers to "defend yourself against these devils and demons." They ended the video with "See you at home, Don. Love you."

> Later that same day, the Trains were involved in another shooting with police, during which the Trains were killed.

(Mot. at 7.) Defendant also moves the Court to limit the Government to one witness to discuss the Wieambilla shooting.

The Government objects to the limitations Defendant proposes, arguing that the evidence it contemplates introducing, as set forth above, is highly probative of Defendant's motive and intent as to the threat alleged in Count 1, and any danger of unfair prejudice, either by association with the Trains or by the purely inflammatory nature of their actions, will be adequately addressed by limiting instructions.

In deciding the instant Motion, the Court must strike the appropriate balance between the two competing legitimate interests the parties have identified: On the one hand, the Government is entitled to provide context for the language referencing the Trains that Defendant used in the message that it alleges is a threat in Count I of the Indictment, and to present probative evidence as to the Defendant's intent in making the charged statement and his motive for doing so, including evidence relating to the Trains and his relationship with them. On the other, the presentation may not unfairly prejudice Defendant or invite the jury to convict Defendant on Count I—or any other count of the Second Superseding Indictment—based on his association with the Trains or their acts. The Court now considers whether the limitations Defendant seeks on evidence or discussion of certain items are justified under the Federal Rules of Evidence, and if they are not, whether some other limitation is appropriate.

**Testimony and Discussion as to What Occurred at Wieambilla on December 12**

The Court will not limit evidence and discussion of the events at Wiembilla to the statement of facts proposed by Defendant. The Government has shown in its briefing and argument that the Trains' acts in confronting the officers who came onto their property, shooting and killing two of them, and then sending a message that night that informed Defendant of what had happened, are probative of Defendant's motive and intent in his

- 4 -

later action transmitting the alleged threat. Similarly, Defendant's actions in consulting news sources between December 12 and December 16, from which a finder of fact could infer Defendant learned of the Trains' fate, is probative of the same issues.

The Government has demonstrated a sustained remote relationship between Defendant and the Trains in which they shared via social media their views—frequently and at length—on religion, social issues, politics and government, to include hostility toward law enforcement and a stated intent to confront same. While the Court concludes that their communications on religion, social issues and politics generally are not germane to this matter, beyond the fact that such topics were discussed might tend to show trust and familiarity in the relationship, the discussions of a shared animus toward law enforcement and a desire to confront its agents, when stated or agreed to by Defendant, is relevant as to his intent and motive. And the fact that when Defendant learned the Trains had engaged in armed confrontation with police, killed two of them, and then were later killed in a subsequent armed confrontation with additional officers, he reacted by making the statements he did in the December 16 video is also probative of those issues. Put plainly, Defendant's affection for the Trains and his knowledge that they shared many of his beliefs and designs with respect to law enforcement and confrontation, coupled with his knowledge of their actions consistent with those beliefs on December 12 and what happened to them as a result, and how that knowledge enraged him as is evident from the December 16 video, is probative of his motive and intent.

The Court therefore will allow fact witness testimony as to why the constables came to be at the Trains' property on December 12, 2022, that upon entering onto the property the Trains fired upon them, that the Trains killed two constables and a neighbor, and that upon the return of an additional force of officers, the Trains again engaged in gunfire and were themselves killed. The Court also will allow the use of the map in Exhibit 2 of the Government's Response (Doc. 129 at 6), if proper foundation is provided, and subject to possible redactions if warranted. The Court will require neutral factual descriptions, but no characterizations—for example, witnesses may describe that Gareth or Stacey shot or

killed a constable, but may not state that they ambushed or murdered the officer. Such terms may be factually accurate, but they also are loaded, and threaten the balance of the Court's ruling by inviting the jury to focus on the horror of what the Trains did—for which Defendant is not responsible—rather than the fact of the confrontation and killings as a marker for Defendant's knowledge. They also are the product of hindsight, and therefore shift the jurors' focus away from the relevant timing issues here: what did Defendant know at the point he made his video statement on December 16, 2022, and did that knowledge motivate him to make a threat or otherwise inform his intent to do so? Details of the Wieambilla incident developed from the investigation, unless they were widely and immediately reported in the media, would not have been within Defendant's knowledge by December 16. He likely would have known only what he learned from his historical communications with the Trains, their final video on the night of December 12, and what was available on websites in the four days after the shootings—that the Trains told him they were hostile to law enforcement and had an inclination to fight police if they came onto the Trains' property; that the Trains did so on December 12, saying in their last YouTube channel posting, "they came to kill us, and we killed them," that he never heard from the Trains again, and that media thereafter reported the killings of the constables, the neighbor, and later, the Trains themselves.

**<u>Communications Between Defendant and the Trains</u>**

The Court will allow the Government to present evidence showing communications between Defendant and the Trains from both Defendant's devices or accounts and the Trains' devices or accounts, as long as: 1) there is foundation proving or supporting the inference that Defendant made, received or had access to such communication; and 2) the specific communication contributed to Defendant's knowledge of information probative to his motive or intent regarding the alleged threat in Count I, as set forth above. This would include the electronic communications in Exhibits 1 and 9 through 17 identified in the Government's Response (Doc. 129 at 6.)

**Evidence re: Layout and Features of the Trains' Property at Wieambilla**

The Court next considers the five remaining photographs of the Trains' property the Government has identified as evidence it likely will offer, and which Defendant seeks to preclude. The Government may not infer or argue that simply because Defendant and the Trains lived in a similarly isolated manner in rural areas, or in a similar way, in that both lived to a high degree a subsistence lifestyle, that Defendant has a predisposition to act as the Trains did, or to threaten to do so. And it may not introduce any of those photographs for that purpose either. But the Government has shown communications Defendant received from the Trains illustrating what can be described fairly as a hostile attitude toward law enforcement, a highly territorial mindset over their property and a desire or intention to engage anyone who crosses the "line," or the "Rubicon," or the "gate," with force. Several of the Trains' statements dwelt on the property's gate as bearing particular significance. The Government also points to statements that can fairly be read to evince Defendant's agreement with or support of that desire or intent. Finally, in its supplemental brief, the Government identified at least one statement Defendant made to law enforcement upon his arrest acknowledging that the Trains had set up their property for surveillance purposes to know when people entered upon it. The statements by the Trains imparting general knowledge of the features of their property and how they would use it, as well as Defendant's admission of that knowledge, and his apparent approval of the Trains' approach, are probative of whether or not Defendant harbored a motivation and or intent to threaten violence against law enforcement. The Government therefore may introduce the photographs of the Trains' front gate, roadway, hide, and strategic position in Exhibits 3 through 7 of the Response[2].

Having drawn the above limitations on the evidence pertaining to the Trains and the events at Wieambilla, the Court concludes that all of the evidence it will allow is probative

---

[2] In its Response, the government also indicated an intent to introduce photographs depicting features Defendant's property in Heber (Exhs. 18-22, Resp. at 6). The Court did not consider or rule upon these proposed exhibits because it did not consider them the subject of the instant Motion, which pertains only to evidence associated with the Trains' property and what happened on it.

1    of Defendant's motive or intent as to Count I. In some cases, the probative value of that
2    evidence is not outweighed at all, or it is not outweighed substantially, by the danger of
3    unfair prejudice, confusion, misleading of the jury, or undue amount of time spent. As to
4    the remaining pieces of evidence, where the calculus is closer, the Court will introduce a
5    limiting instruction at the outset of the testimony regarding Wieambilla and the Trains,
6    stating that they are about to hear evidence involving an armed confrontation that occurred
7    in December 2022 between police in Queensland, Australia and persons with whom
8    Defendant corresponded via social media; that Defendant has never been to Australia and
9    was not involved in that confrontation, and that the evidence is not being offered to show
10   that he bore any responsibility for it, or that simply because he corresponded with persons
11   involved in it that jurors can infer his guilt in any of the charges in the instant matter. Indeed
12   they cannot. The Court will further instruct that evidence is being offered only for the
13   limited purpose of allowing the jury to decide whether or not it is probative of Defendant's
14   motive or intent regarding the threat alleged in Count I of the Indictment, and the jury may
15   consider it for no other purpose. The Court will repeat the instruction at the conclusion of
16   trial with the other final instructions.

17          The Court also contemplates giving a similar limiting instruction upon the showing
18   of the first photograph of the Trains' property, clarifying that the jury may not consider
19   that Defendant is guilty of any charge based on similarities between the features of his and
20   the Trains' property or that they lived similarly isolated or subsistence lifestyles. The Court
21   contemplates repeating that instruction at the end of trial as well. The Court concludes
22   those instructions, along with the limitations it will impose on the evidence and discussion
23   of the Wieambilla evidence, will safeguard against the danger of unfair prejudice
24   substantially outweighing the probative value of that evidence.
25   …
26   …
27   …
28

For the reasons set forth above,

**IT IS ORDERED** granting in part and denying in part Defendant's Motion *in Limine* Re: Wieambilla Shooting (Doc. 121).

Dated this 31st day of March, 2025.

Honorable John J. Tuchi
United States District Judge